UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

BRENDA L. BROWN,                      )
                                      )
            Plaintiff,                )
                                      )
      vs.                             )       Case No. 2:16 CV 44 ACL
                                      )
NANCY A. BERRYHILL,[1]                )
Acting Commissioner of Social Security, )
                                      )
            Defendant.                )

## MEMORANDUM

Plaintiff Brenda L. Brown brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the Social Security Administration Commissioner's denial of her application for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.

An Administrative Law Judge ("ALJ") found that, despite Brown's severe mental

impairments, she was not disabled as she had the residual functional capacity ("RFC") to perform

jobs that exist in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with

consent of the parties, pursuant to 28 U.S.C. § 636(c).   A summary of the entire record is

presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

---

[1]   Nancy A. Berryhill is now the Acting Commissioner of Social Security.   Pursuant to Rule
25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting
Commissioner Carolyn W. Colvin as the defendant in this suit.

# I.  Procedural History

Brown filed an application for DIB on March 27, 2013,[2] claiming that she became unable to work on September 8, 2012, because of depression, attention deficit disorder, obsessive-compulsive disorder, anxiety, fatigue, and bipolar disorder.  (Tr. 159-60, 215.) Brown's claim was denied initially.  (Tr. 89-93.)  Following an administrative hearing, Brown's claim was denied in a written opinion by an ALJ, dated April 30, 2015.  (Tr. 24-35.)  Brown then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on June 2, 2016.  (Tr. 9, 1-4.)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.

In the instant action, Brown argues that the ALJ erred "in determining Claimant's mental impairments did not equal listings 12.04, 12.06 or 12.08."  (Doc. 17 at 5.)  Brown also argues that the ALJ erred "in failing to give more weight to treating doctor, Dr. Onik's opinion and treating CSS, Pamela Moller."  *Id.* at 11.

# II.  The ALJ's Determination

The ALJ found that Brown last met the insured status requirements of the Social Security Act on September 30, 2012, and did not engage in substantial gainful activity during the period from her alleged onset date of September 8, 2012, through her date last insured of September 30, 2012.  (Tr. 26.)

In addition, the ALJ concluded that Brown had the following severe impairments:

---

[2]   On October 26, 2011, Brown filed applications under Title II and Title XVI, alleging a disability onset date of January 15, 2005.  (Tr. 73-75.)  These applications were denied on February 16, 2012.  *Id.*

attention deficit disorder ("ADD"), bipolar disorder, and generalized anxiety disorder.   *Id.*   The

ALJ found that Brown did not have an impairment or combination of impairments that meets or

medically equals the severity of one of the listed impairments.   (Tr. 27.)

As to Brown's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned
> finds that, through the date last insured, the claimant had the
> residual functional capacity to perform a full range of work at all
> exertional levels but with the following non-exertional limitations:
> The claimant can perform simple, routine tasks.   The claimant is
> limited to occasional changes in a routine work setting with only
> occasional contact with the public or co-workers.

(Tr. 28.)

The ALJ found that Brown's allegations regarding the extent of her limitations were not

credible.   (Tr. 30.)   In determining Brown's RFC, the ALJ indicated that he was assigning

considerable weight to the opinions of consultative psychologist Frank Froman, Ed.D.; and to the

opinion of the state agency psychologist Mark Altomari, Ph.D., regarding Brown's limitations.

(Tr. 33.)   The ALJ accorded little weight to the opinions of treating primary care doctor Jan F.

Onik, D.O.; and to the opinions of case worker Pamela Moller, CSS.   *Id.*

The ALJ further found that Brown was unable to perform past relevant work, but was

capable of performing other jobs existing in the national economy, such as cleaner, kitchen helper,

and laundry worker.   (Tr. 34-35.)   The ALJ therefore concluded that Brown was not under a

disability, as defined in the Social Security Act, at any time from September 8, 2012, the alleged

onset date, through September 30, 2012, the date last insured.   (Tr. 35.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability
> insurance benefits filed on March 27, 2013, the claimant was not

> disabled under sections 216(i) and 223(d) of the Social Security Act
> through September 30, 2012, the date last insured.

*Id.*

# III.  Applicable Law

## III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

      6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).   The Court must also consider any evidence which fairly detracts from the Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."   *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted).   *See also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

## III.B.  Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.   A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any other kind of substantial gainful work which exists … in significant numbers either in the region where such individual lives or in several regions of the country."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively

disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to

make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. *See id.* Next, the Commissioner must determine the severity of the impairment based on those ratings. *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical

findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. *See id.* If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare an RFC assessment. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV. Discussion

Brown argues that the ALJ erred in determining that her mental impairments did not equal Listings 12.04, 12.06, or 12.08. She further argues that the ALJ erred in discrediting the opinions of treating physician Dr. Onik and case worker Ms. Moller. The undersigned will discuss these claims in turn.

As an initial matter, the Court notes that Brown's insured status is relevant in this case. Brown alleged an onset of disability date of September 8, 2012, and her insured status expired on September 30, 2012. (Tr. 24.) To be entitled to benefits under Title II, Brown had to demonstrate she was disabled prior to September 30, 2012. *See* 20 C.F.R. § 404.130. Thus, the period under consideration in this case is from September 8, 2012, through September 30, 2012.

### 1. Listings

"[T]he listings were designed to operate as a presumption of disability that makes further inquiry unnecessary. That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work." *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990). "If the claimant wins at the third step (a listed impairment), [ ]he must be held disabled, and the case is over." *Jones v. Barnhart,* 335 F.3d 697, 699 (8th Cir. 2003). But "[m]erely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing. 'An

impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify.'" *McCoy v. Astrue,* 648 F.3d 605, 611-12 (8th Cir. 2011) (quoting *Zebley,* 493 U.S. at 530). The burden is on the claimant to demonstrate that his impairment matches all the specified criteria of a listing. *McDade v. Astrue*, 720 F.3d 994, 1001 (8th Cir. 2013).

To meet Listing 12.04 (affective disorders), 12.06 (anxiety related disorders), or 12.08 (personality disorders), Brown had to show either that the "Paragraph A" and "Paragraph B" criteria of the listings were satisfied, or that the "Paragraph C" criteria were satisfied. 20 C.F.R. pt. 404, Subpt. P, App'x 1, § 12.04. The ALJ analyzed Brown's mental impairments under Listings 12.04, 12.06, and 12.08, and found that the Paragraph B criteria were not satisfied. (Tr. 27.) Brown argues that this determination was erroneous because the evidence shows her mental conditions satisfied the Paragraph B criteria.[3]

The Paragraph B criteria are the same for all three Listings—her disorder must result in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 40, subpt. P. appx 1, §§ 12.04, 12.06, 12.08.

The ALJ found that Brown had mild restriction in her activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration.[4] (Tr. 27.) This determination is supported by substantial evidence.

---

[3] There is no contention that Brown satisfied the Paragraph C criteria.
[4] Brown does not dispute the ALJ's finding that she had no episodes of decompensation of extended duration during the relevant period.

In support of his finding that Brown had mild limitations in her activities of daily living, the ALJ noted that Brown reported that she handled her own personal care and performed household chores during the relevant period. (Tr. 27, 376.) The ALJ also considered that Brown cross-stitched, read the Bible, played board games, went for walks, and regularly exercised. (Tr. 32, 376, 475.)

Brown argues that the fact that she needed a case worker to accompany her to doctor appointments shows that she had marked limitations in activities of daily living.

At the hearing, Brown testified that she saw a case worker, Pam Moller, twice a month. (Tr. 60.) Brown stated that Ms. Moller picks her up and takes her to doctor appointments, takes her to the store, and "anything I need to talk about, just different things. I mean she's a big help." (Tr. 60-61.) Although Brown did receive case worker services from Ms. Moller through Comprehensive Health Systems, there is no record that she received these services during the relevant period. The Comprehensive Health Systems records do not begin until September 2013, one year after the expiration of her insured status, and continue throughout 2014. (Tr. 472-513.) Contrary to Brown's argument, there is no evidence that Brown received case worker services, much less required such services, prior to September 30, 2012.

In assessing Brown's limitations in activities of daily living, the ALJ properly considered evidence from the relevant period. The evidence reveals that Brown handled her own personal care, performed household chores, cross-stitched, read the Bible, played board games, went for walks, and regularly exercised. (Tr. 27, 376, 475.) Brown also worked part-time at various cleaning jobs from 2012 to 2014. (Tr. 26, 194-95, 376, 378, 406.) Thus, the ALJ's finding that Brown had only mild limitations in her activities of daily living prior to September 30, 2012 is supported by substantial evidence.

The ALJ next found that Brown was moderately limited in her social functioning.   (Tr. 27.)   Brown contends that this was erroneous because her records show that she isolated herself. The ALJ acknowledged Brown's testimony that she isolated herself, but also noted that she was active in her faith and interacted with her pastor prior to her date last insured.   (Tr. 27, 377.)   The medical evidence reveals that Brown's ability to relate was "generally good" (Tr. 376), she exhibited good eye contact (Tr. 376, 459), she was active in her faith ministry and described her pastor as her "mentor" (Tr. 377, 406), her appearance and behavior were normal (Tr. 406-09, 414, 459), and she was "polite and cooperative" during examinations (Tr. 459, 476).   The ALJ's determination that Brown had moderate limitations in her social functioning during the relevant period is, therefore, supported by substantial evidence.

As to Brown's ability to maintain concentration, persistence, or pace, the ALJ found that Brown was moderately limited.   (Tr. 27.)   The ALJ stated that Brown testified that she had difficulty focusing, comprehending, staying on task, and finishing what she starts.   (Tr. 27, 62.) He noted that Brown also testified that she was able to follow a television show or a movie plot if she watches it from the beginning.   (Tr. 27, 63.)

Brown contends that it is "most obvious" that she had marked limitations in concentration, persistence, and pace.   (Doc. 17 at 11.)   She states that, even on medication, she has repeatedly failed the GED test.

The medical record reveals that Brown has a long history of complaints of difficulty concentrating due to symptoms of ADD.   Brown complained to her medical providers that she was unable to pass the GED due to problems concentrating, and was prescribed different medications to treat these symptoms.   (Tr. 396-400.)   The medical evidence reveals that Brown's concentration problems improved with medication management.   (Tr. 31, 396, 406-09, 377.)   It

is also noted in the medical record that Brown had a history of abusing her prescribed Adderall,[5] and that she stopped taking her prescribed medications at times.  (Tr. 460, 377, 407.)   Examiners during the relevant period found that Brown was alert and oriented, displayed linear thought processes that were easily directed, and had no memory impairment.  (Tr. 406-09, 459.)   In addition, consultative examiner Dr. Froman found that Brown's history of ADD was "treated successfully with a variety of medications," and that she remained capable of understanding and carrying out simple instructions.  (Tr. 378.)   The medical evidence is consistent with the presence of moderate limitations in concentration, persistence, or pace during the relevant period.

Brown also argues that the GAF scores of below 50 she received constitute evidence that she met a listing.   Specifically, Brown notes that she was assessed GAF scores in the 40s by providers at the Mark Twain Area Counseling Center in 2008 (Tr. 323-27); a score of 45 by Dr. Goldman in August 2012 (Tr. 461); a score of 38 by Dr. Goldman in May 2013 (Tr. 416); and a score of 42 by Comprehensive Health Systems in September 2013 (Tr. 511).[6]

Brown overstates the importance of GAF scores.   "GAF scores may be relevant to a determination of disability based on mental impairments ... [b]ut an ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it."   *Mabry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016) (internal quotation and citations omitted).   The Eighth Circuit Court of Appeals has concluded that GAF scores have "little value" and the level of

---

[5]   Adderall is an amphetamine indicated for the treatment of attention-deficit hyperactivity disorder. *See Physician's Desk Reference ("PDR")*, S-23 (71st ed. 2017).

[6]   A GAF score of 31 to 40 indicates some impairment in reality testing or communication (*e.g.,* speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.,* depressed man avoids friends, neglects family, and is unable to work).   *See American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders* 34 (Text Revision 4th ed. 2000) ("DSM IV-TR").   A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."   *Id.*

severity denoted by a GAF score does not correlate to the severity requirements under the Act. *See Nowling v. Colvin*, 813 F.3d 1110, 1115 n.3 (8th Cir. 2016) (citing *Jones v. Astrue*, 619 F.3d 963, 973-74 (8th Cir. 2010)) ("Moreover, the Commissioner has declined to endorse the [GAF] score for use in the Social Security and [Supplemental Security Income] disability programs and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings."). Accordingly, "[a] litany of scores in the 41-50 range, although indicating a serious problem with occupational functioning in the DSM-IV sense, does not necessitate a finding of disabling limitations under the Act." *Doolittle v. Colvin*, 13-CV-04261-C-DGK-SSA, 2014 WL 7369635, at *2 (W.D. Mo. Dec. 29, 2014). Further, the current edition of the Diagnostic Statistical Manual of Mental Disorders abandoned the use of GAF scores "for several reasons, including its conceptual lack of clarity. . .and questionable psychometrics in routine practice." American Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

In this case, the 2008 GAF scores were assessed four years prior to Brown's alleged onset of disability, and do not reflect her functioning during the relevant period. As to the score of 45 noted by Dr. Goldman in August 2012, the ALJ indicated that he was assigning little weight to this score, because it was assessed when Brown had been off her medications for at least three months. (Tr. 31, 461.) The remaining GAF scores to which Brown refers were assessed after the expiration of her insured status. Notably, Dr. Froman assessed a GAF score of 52[7] during his February 2012 consultative examination, which denotes moderate symptoms consistent with the

---

[7] A GAF score of 51 to 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *See DSM IV-TR* at 34.

ALJ's finding.   (Tr. 52.)   The ALJ indicated that he was assigning "little weight" to this GAF score as well, as it was only a "snapshot" opinion about Brown's level of functioning.   (Tr. 31.)

The ALJ did not err in assigning more weight to the medical evidence and testimony than to the GAF scores.   The ALJ discussed the findings on examination, as previously discussed, and found that they revealed few abnormalities.   He also pointed to Brown's activities during the relevant period and her ability to work part-time jobs.

The Court concludes that substantial evidence supports the ALJ's determination that Brown failed to meet her burden of showing she met or equaled a listing prior to September 30, 2012, her date last insured.

### 2.    Opinion Evidence

Brown next contends that the ALJ erred in discounting the opinions of treating physician Dr. Onik and case manager Ms. Moller.

On September 8, 2012, Dr. Onik completed a Medical Source Statement of Ability to do Work-Related Activities (*Physical*), in which he found that Brown could lift and carry only ten pounds, stand and walk less than two hours in an eight-hour workday, and sit less than two hours in an eight-hour workday.   (Tr. 590.)   Brown was only able to sit or stand for thirty minutes before she would be required to walk for ten-minute periods.   *Id.*   Dr. Onik also stated that Brown had limitations "due to history of learning disability, lack of focus, concentration, and memory problems."   (Tr. 592.)   He found that Brown would be absent from work due to her impairments more than four days per month, and be off task twenty-five percent or more.   (Tr. 592-93.)   Dr. Onik identified the medical findings supporting Brown's limitations as: "She has been in L-D classes in school and treated for ADD still."   (Tr. 592.)   Finally, he expressed the opinion that

Brown's disability began approximately ten years prior to her alleged onset of disability due to her "mental status and history of ADD." (Tr. 593.)

The ALJ accorded "little weight" to Dr. Onik's opinions. (Tr. 33.) The ALJ stated that there was "no basis for the extreme exertional limitations" found by Dr. Onik, and pointed out that Brown was not even alleging a *physical* impairment. *Id.* The ALJ further stated that Dr. Onik is a primary care doctor of osteopathy, not a psychiatrist, and his opinion that Brown would be off task twenty-five percent or more of the time was outside the scope of his expertise. *Id.*

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart,* 421 F.3d 745, 749-50 (8th Cir. 2005) (internal marks omitted)). The opinion of a treating physician will be given "controlling weight" only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Prosch v. Apfel,* 201 F.3d 1010, 1012-13 (8th Cir. 2000). The record, though, should be "evaluated as a whole." *Id.* at 1013 (quoting *Bentley v. Shalala,* 52 F.3d 784, 785-86 (8th Cir. 1997)). The ALJ is not required to rely on one doctor's opinion entirely or choose between the opinions. *Martise v. Astrue,* 641 F.3d 909, 927 (8th Cir. 2011). Additionally, when a physician's records provide no elaboration and are "conclusory checkbox" forms, the opinion can be of little evidentiary value. *See Anderson v. Astrue,* 696 F.3d 790, 794 (8th Cir. 2012). Regardless of the decision, the ALJ must still provide "good reasons" for the weight assigned the treating physician's opinion. 20 C.F.R § 404.1527(d)(2).

The ALJ must weigh each opinion by considering the following factors: the examining and treatment relationship between the claimant and the medical source, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship,

whether the physician provides support for his findings, whether other evidence in the record is consistent with the physician's findings, and the physician's area of specialty. 20 C.F.R. §§ 404.1527(c)(1)-(5), 416 .927(c)(1)-(5).

The ALJ provided sufficient reasons for discrediting Dr. Onik's opinion. As pointed out by the ALJ, Dr. Onik's opinions regarding Brown's *physical* limitations are wholly unsupported by the record. Brown does not appear to challenge the ALJ's decision to reject Dr. Onik's findings regarding disabling physical limitations.

As to Brown's mental limitations, the ALJ properly noted that Dr. Onik was a primary care doctor of osteopathy and not a psychiatrist. *See Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) ("The Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

Dr. Onik's opinions are also unsupported by his treatment notes. The record reveals that Dr. Onik and other practitioners in his practice saw Brown for her complaints of poor attention span associated with adult ADD approximately monthly from November 2013 through January 2015. (Tr. 514-33.) Brown was treated with medication adjustments. *Id.* Upon examination, a nurse practitioner noted that Brown's "attention span and ability to concentrate [were] normal" on May 6, 2014. (Tr. 529.) On November 1, 2014, Dr. Onik found that Brown had a "normal attention span and ability to concentrate," and noted that Brown was doing well on her medication, was looking for work, and felt more organized. (Tr. 522-23.) Brown reported that she was doing well on medication in December of 2014. (Tr. 517, 520.) On January 26, 2015, Brown reported that she was concerned whether she would be eligible for disability. (Tr. 514.) Dr. Onik stated that, with her history of learning disability in school and no high school education, he did not

"think there would be a problem." (Tr. 514.) Upon examination, Dr. Onik noted Brown was alert and oriented, with no impairment of recent or remote memory. (Tr. 515.) Dr. Onik's treatment notes, in which he noted normal attention span and concentration on exam and improvement with medication, are inconsistent with his opinions.

Dr. Onik's opinions are also inconsistent with the opinions of Dr. Froman and Dr. Altomari. Dr. Froman, a Clinical Psychologist, examined Brown February 10, 2012, at the request of the state agency. (Tr. 375-78.) Brown was fully cooperative; appropriately attired; and her hygiene was "excellent." (Tr. 375.) Brown reported that she dropped out of school in the ninth grade because she had a baby. *Id.* She indicated that she took Vyvanse[8] for ADD, which helped. *Id.* Brown was currently cleaning two houses, and prior to that she worked as a correction officer at a prison for two-and-a-half years. (Tr. 376.) Upon mental status examination, Brown was oriented times three and in good contact with reality. (Tr. 376.) Brown reported that she could read and write and believed her spelling to be good. (Tr. 377.) Dr. Froman estimated her IQ as in the high 80s to low 90s. *Id.* Dr. Froman stated that Brown's history of ADD had been treated successfully with medication. *Id.* He found Brown to be "brittle" emotionally and feeling some sense of being lost in life. *Id.* Dr. Froman stated that Brown had very low executive skills and becomes rapidly dependent on others to guide her. (Tr. 377-78.) Brown's mood tended to fluctuate and there were days when she felt like she cannot "get going." (Tr. 378.) Dr. Froman diagnosed Brown with ADD-inattentive type by history; bipolar disorder I; episodic panic attacks; generalized anxiety disorder; mixed personality disorder with borderline, obsessive, and dependent traits; and a GAF score of 52. *Id.* Dr. Froman expressed the opinion that, with appropriate medication and mentoring, Brown was capable of

---

[8]  Vyvanse is a stimulant drug indicated for the treatment of ADD. *See PDR* at S-975.

performing "one or two step assemblies at a competitive rate."  *Id.*  He found that Brown was able to relate modestly to co-workers and supervisors; understand simple and written instructions; manage benefits; and withstand the stress associated with low levels of competitive employment, "such as the type that she is now doing."  *Id.*

The ALJ assigned "considerable weight" to Dr. Froman's opinions, finding that they were based on a psychological examination and were consistent with the treatment notes that show good control of Brown's mental symptoms with adherence to treatment.  (Tr. 33.)  The ALJ provided sufficient reasons for according considerable weight to Dr. Froman's opinions.  Dr. Froman was a specialist in psychology, his opinions were based on a psychological examination, they were consistent with the other medical evidence of record, and the opinion was provided less than a year prior to the expiration of Brown's insured status.

In addition, state agency psychologist Dr. Altomari found that Brown had mild limitations in her activities of daily living and ability to maintain social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (Tr. 393.)  Dr. Altomari expressed the opinion that Brown's impairments do not meet or equal a listing.  (Tr. 395.)  Dr. Altomari's opinion was based on a review of the record, including the medical records of Dr. Onik and Dr. Froman.  (Tr. 394.)

Brown also contends that the ALJ erred in discrediting the opinion of Pamela Moller, Brown's "treating CSS."  (Doc. 17 at 11.)  Ms. Moller, a Community Support Specialist ("CSS"), at Comprehensive Health Systems, Inc., completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) on February 27, 2015.  (Tr. 612-14.)  Ms. Moller expressed the opinion that Brown had marked limitations in the abilities to understand and remember simple instructions; carry out simple instructions; make judgments on simple

work-related decisions; understand and remember complex instructions; carry out complex instructions; and make judgments on complex work-related decisions. (Tr. 612.) Ms. Moller stated that Brown has displayed better functioning while receiving Adderall. *Id.* Ms. Moller noted that Brown has moderate limitations in her ability to interact appropriately with the public. (Tr. 613.) She indicated that Brown would be absent from work more than four days per month due to her impairments, and would be off task twenty-five percent or more of the time. *Id.*

The ALJ assigned "little weight" to Ms. Moller's opinions because she was not an "acceptable medical source" as defined in the regulations. (Tr. 33.) The ALJ further stated that the opinion was rendered three years after Brown's date last insured, and that the extreme limitations are not supported by Brown's overall normal mental status examinations. *Id.* Finally, the ALJ stated that the totality of the treatment notes show that Brown's symptoms were well-controlled when she adheres to her medication regimen. *Id.*

The ALJ properly evaluated Ms. Moller's opinions. "[T]here are three major distinctions between acceptable medical sources and other[ sources]: (1) Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment, (2) only acceptable medical sources can provide medical opinions, and (3) only acceptable medical sources can be considered treating sources." *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (citations omitted). "Other sources" include medical sources such as nurse practitioners, physician assistants, chiropractors, and licensed clinical social workers or therapists. *Id.*

The ALJ accurately found that Ms. Moller was not an acceptable medical source whose opinion was entitled to weight. More importantly, the opinion was dated three years after the expiration of Brown's insured status. As such, Ms. Moller's opinions were not probative of Brown's condition for the time period for which benefits were denied. Additionally, Ms.

Moller's opinions were inconsistent with the medical evidence of record near the relevant time, which demonstrated that Brown exhibited few symptoms on exam and her symptoms improved with medication.

The ALJ concluded that Brown had the mental residual functional capacity to perform simple, routine tasks; and was limited to occasional changes in a routine work setting with only occasional contact with the public or co-workers. (Tr. 28.) After determining Brown's RFC, the ALJ found, with the assistance of a vocational expert, that Brown could perform other jobs existing in significant numbers in the national economy. (Tr. 34.) Brown does not challenge the ALJ's step five findings, but implicitly disputes the ALJ's mental RFC determination.

Residual functional capacity is defined as that which a person remains able to do despite her limitations. 20 C.F.R. § 404.1545(a), *Lauer v. Apfel,* 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. 20 C.F.R. § 404.1545(a); *Anderson v. Shalala,* 51 F.3d 777, 779 (8th Cir. 1995); *Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005). A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. *Id.; Hutsell v. Massanari,* 259 F.3d 707, 711-12 (8th Cir. 2001); *Lauer,* 245 F.3d at 703-04; *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000). However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant is able to perform certain functions. *Pearsall,* 274 F.3d at 1217 (8th Cir. 2001); *McKinney,* 228 F.3d at 863. The claimant bears the burden of establishing her RFC. *Goff,* 421 F.3d at 790.

The ALJ's mental RFC determination is supported by substantial evidence in the record as a whole. The ALJ properly weighed the medical opinion evidence, as discussed above. The ALJ's finding that Brown retained the capacity to perform a limited range of simple work is supported by the opinion of Dr. Froman. It is also supported by medical evidence demonstrating few objective findings on examination, and Brown's statements regarding her daily activities during the relevant period.

The undersigned acknowledges that there is evidence that tends to support limitations more significant than those in the RFC; however, that evidence is mostly dated *after* Brown's date last insured and is therefore of less relevance. The relevant question before the ALJ concerned only Brown's medical conditions and limitations prior to the date last insured. *See Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014) (citing *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997)) (if social security disability claimant is not insured for Title II purposes, the Court only considers the claimant's medical condition as of her date last insured); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) (citing *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)) (to be entitled to benefits, social security claimant must establish that she was disabled prior to the expiration of her insured status). Further, "as long as substantial evidence in the record supports the Commissioner's decision, [the Court] may not reverse it either because substantial evidence exists in the record that would have supported a contrary outcome or because [the Court] would have decided the case differently." *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001).

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

/s/ Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 20th day of September, 2017.